Also, if you are citing to the record, it really helps if you give us an actual site, and we appreciate that very much. Please be on notice, though, that I actually have my iPad up here, and I can look up that site, so it needs to be accurate. So with that, we'll call the first case, 18-40369, French v. Linn Energy, and we'll hear first from Mr. Kinsey. Kinsey, Jr. Good morning, and may it please the Court. John Kinsey appearing on behalf of the appellants. The appellees have recognized that there's a three-part test to determine whether an interest falls within the ambit of a security for purposes of Section 510. The first is obviously whether the claim is for damages, the second is whether the claim involves securities, and the third is whether the claim arises from the purchase, sale, rescission of securities of the debtor. The bankruptcy court in this case, by determining the income stream payments, the interest at issue in this case was a security, and also by determining that the claim arose from the sale of a security of the debtor. Income stream payments clearly don't fall within any of the enumerated categories in Section 101, Subdivision 49 of the Bankruptcy Code. And so in this case, the Court should not apply the residual clause, as the appellees have suggested, and that's under Subdivision 49A.14. The question as to whether the residual clause applies is whether the interest at issue bears the hallmarks of a security. And that's the Lehman case that's cited by the appellees. In this case — It's a question that's not directly related to that, but I've just been wondering about. Yes. How can a company that arguably owed $9 million in dividend stream or whatever you want to call it over two years file bankruptcy? I mean, what happened? Your Honor, as a — It's a very profitable company. $9 million in two years of the 37.5 percent of this, that, or the other dividend stream seems very high to me. So what happened? Your Honor, that's one of the reasons why we ultimately want to engage in some discovery. I think the appellees have their contentions there. I think they would argue that there was a decline in the market for oil. You know, unfortunately, we have a situation with respect to our clients where they were persuaded to enter into and agree to these transactions with some representations that were made that, frankly, were erroneous. And ultimately, shortly after agreeing to that, there was a bankruptcy filing. I think we have questions, obviously, about — many questions about the underlying facts there. And, of course, had my clients known, and in particular, Mr. Bennett, known about all of those circumstances, they wouldn't have agreed. And his agreement was, frankly, material. He was kind of the person who all the family members looked up to at this time and was 88 at the time. And the appellees really wanted to get his approval for this transaction. So we do think that discovery and after discovery and evidentiary hearing would help bear a lot of those questions down. What would the discovery show? I mean, I guess I'm thinking the judge here seems to have assumed that they did, in fact, commit fraud, for example, in talking Mr. Bennett into agreeing and so on and so forth for the purpose of deciding the subordination. So what facts would — could be revealed that would alter the outcome here? Your Honor, we do think that those facts underlying why the bankruptcy petition was filed in the first place would be relevant. In addition — How? Well, so one of the things that we are, you know, obviously concerned about is the securities of the debtor. And here we're talking about income stream payments that predated the transaction. They were obligations of Barry Petroleum Company, Barry Holding Company. And as appellees have said, those entities no longer exist as a result of these transactions. Those — the shares that kind of — that ultimately formed those obligations way back in the 40s no longer exist. They no longer existed as of 1986. And so how can those be securities of the debtor? I think that's something that discovery would ultimately be very interesting to be able to determine. And that's just — that's just one fact. Obviously, I think we'd like to understand why the petition was filed in the first place. I think we'd like to understand also the scope of the misrepresentations. And those, I think, would ultimately go to many of the issues — many of the issues here, including whether or not this is a — this is a security or not. Has everything been liquidated? I'm sorry? Has everything been liquidated? And my understanding is that — is that everything has been liquidated, although counsel for appellees may correct me on that. And this is the — this is the remaining debt that ultimately needs to be decided, whether it's debt or whether it's equity. And I think in this case, it ultimately — my understanding, and appellees' counsel can correct me if I'm mistaken, is that the creditors would be paid in full, ultimately, and with the exception of the subordinated creditors, such as — If you all are not a creditor. My understanding is that creditors in the current status quo would be paid in full, regardless of whether we're a creditor or not. But that's something that — Do they have an extra $9 million lying around? That's my understanding, but appellees' counsel can correct me on that. This is quite a bankruptcy. So — But if you are subordinated, would you all get any cents on the dollar or no? If we're subordinated, Mr. Bennett would get nothing for the shares. That's my understanding. So what happens to this extra $9 million that's lying around? Your Honor, I don't have the answer to that question. Okay. This is a — unique case is a good way to put it. And let me ask you that. If we assume, argumento, it is a unique case, then wouldn't the residual clause apply? Because if this is some animal that quacks like a duck but looks like a horse, what do you do with that? Isn't that the residual clause? Well, I think, first, Your Honor, you would look at whether or not this bears the hallmarks of a security. That's the Lehman case. And here, this income stream payment didn't include any ownership or equity. It was just a fixed income stream payment that — But it started from that. I mean, the original bequest was putting the stock into a trust to pay, I guess, nieces and nephews. Right? Originally — Back in the 1920s, that was correct. But ultimately those interests were separated, first back in 1949 and then again in 1986. And once separated — and I think this is actually in Sequest at pages 422 to 423 — an equity holder can't exchange that equity for debt. And I think that even assuming that these interests arose from a security of the debtor, which we disagree with, this falls under Sequest in those particular pages. I don't read Sequest the same way you do. I mean, I think my understanding is that there the court was explaining these other circuits and how they had addressed things and why they'd addressed things. But ultimately held against you. Your Honor, that is absolutely correct that in Sequest the court found that SNL, that was the entity that ultimately provided the money to the debtor, was standing in the shoes of an equity holder. Here, there are many fundamental differences that bring us outside of the — out of the residual clause. And that's not just the statements in Sequest in pages 422 and 423 that say that an equity interest can be converted into something else, such as debt. And I think that's exactly what happened here. But for the — in order to determine whether the residual clause applies, this court looks at a number of different items. The first is whether this ball bears the hallmarks of a security. And we just don't believe that's the case. First of all, these income stream payments — What other debt that you've encountered in the bankruptcy world, or any world, is derived from dividends that a company pays? Your Honor, this is one of those instances where the facts here are relatively unique. I think the closest analog that we've been able to find is the nation's rent case. And the nation's rent case. And that's the 2008 District of Delaware, Bankruptcy Court of the District of Delaware case, involving the make-whole contracts. And in that case, these were individuals who had sold, essentially, their company to the debtor. And they received stock. They received all sorts of other assets. But one of their income streams that they received were these make-whole contracts, which were payments based on the price of the shares at some time in the future. And so that obviously isn't identical to our circumstance because our circumstance concerns giving us payments that are identical to what the dividends would have been. But in that case, nation's rent, the payments were made based on and identical to what the price of the shares would have been on the open market. And in that case, the court found that the payments there actually fell out of Section 510B of the Bankruptcy Code. And therefore, they were debt as opposed to securities. So we believe, although obviously we're talking about a different benchmark, one being the price of the shares, the other being the dividends, we think that case is the closest analog. Racoosin is another case. That's the Ninth Circuit case involving the employee who received payments based on the price of an IPO. But really, the only reason why the appellees assert that this is a security is because the payments were tied to the price of the dividends. And here, if you look at other cases, including the Supreme Court's case in Landreth, none of the hallmarks of a security are present here. They themselves are not dividends. The income stream payments themselves are not dividends. They're payments that mirror dividends, but they themselves are not dividends. They're not negotiable. Mr. Bennett couldn't sell them. They ended at the time he passed. They couldn't be pledged or hypothecated. They had no voting rights. They couldn't appreciate in value. And although the appellees have been able to point to a couple different examples of, well, a security in and of itself, particular securities may not have voting rights, but to be a security, you would typically have to have all the other factors or it would have to look like a security in other respects. So just because it doesn't meet one of the factors in Landreth doesn't mean that just because we don't have voting rights that that's somehow dispositive. So we believe, in fact, that we're closest to one of the exceptions, and that's 101B6 relating to profit-sharing agreements. And that section makes very clear that profit-sharing agreements that are not registered with the SEC are, in fact, outside of the definition of a security. So we believe, just in the first instance, that this is not a security. But even if it were, the appellees cannot argue that this claim arises from the purchase or sale or rescission of a security of the debtor. These income stream payments predated the Linn-Berry exchange of shares. They were not a share that was exchanged as part of that transaction. And while we acknowledge that at their very infancy they had some relation to the 1927 bequest, they were ultimately converted into many other things along the way until 1986, at which case the underlying shares were retired. And ultimately, they cannot be related to any of those transactions or arise from those transactions as a matter of law. The right to payment is not based on the bequest. We're not asserting that any breach or tort occurred in 1927 or 1986. And ultimately, these rights arose from an entity that no longer exists as opposed to the debtor itself. And with that, I'd be happy to answer any questions and reserve my time. I apologize. I gave you the best information I could regarding the status of the bankruptcy, but I don't have all that information in front of me. Thank you. Thank you. We reserve time for rebuttal. Mr. Adams. May it please the Court, William Adams for Berry Petroleum Company. I think I'll start and perhaps clear up some confusion about the bankruptcy, if that's okay. The $9 million in dividends were from 2013 to 2015. Lynn and Berry declared bankruptcy in 2016. So the dividends— That's only a year later. Market— You said it's $9 million and whatnot. I just—how do you explain that? I can't give you an answer to that other than the market shifts. I don't think there's any question as to the propriety of the bankruptcy proceeding here. Well, oil and gas has been up and down for the last several decades, and somehow they've been managing to pay Mr. Bennett all this money for the last several decades, and then, woo, out of nowhere, after $9 million, all of a sudden people aren't using oil and gas anymore? My understanding, and this is my limited understanding, Your Honor, is that ultimately after the acquisition, Lynn's acquisition of Berry, Lynn was saddled with more debt through Berry than it necessarily had anticipated, and so it led to the bankruptcy filing. But there is now a—there is a confirmed plan in the Bankruptcy Court. Neither Lynn nor Berry were liquidated. They were reorganized. They emerged from bankruptcy as separate entities, unaffiliated entities. And the creditors were not paid in full. Pursuant to the confirmed plan, the creditors were paid 35 cents on the dollar, and both Lynn and Berry have reserved stock to pay the Bennett claim if this claim was to be found to be proper. So they elected to receive payment in stock were there to be a liability in the claim not to be subordinated. If the claim is subordinated, as the District Court and the Bankruptcy Court ruled, they'll get zero because the creditors were not paid in full. And the absolute priority rule, which is the bedrock principle of bankruptcy law, requires the creditors be paid before shareholders. So that money would go back to the newly reorganized companies? The— No payment to the Bennett estate. There would be no—if the claims are subordinated, as the courts have ruled below, there would be no payment to the Bennett estate. If the claims are not subordinated and the — and Berry or Lynn are found to be liable on the claim, then they would be — then Bennett would — the Bennett estate would receive stock either from Lynn or Berry, depending on who — which entity was — But not that money that's been reserved for the Bennett estate would go to the creditors? No. To the reorganized companies. There is no — the reservation under the plan, under the confirmed bankruptcy plan, is purely in stock to pay out — to pay out these claims. And these are the last remaining claims in the bankruptcy proceeding. With that, if I could turn to the deemed dividend payments or the income stream payments. My friend on the other side spent a lot of time trying to explain why those are not securities. But we think they're securities, and the Bankruptcy Court certainly found that they were. But that's — we think you don't need to resolve that issue here, because there are three separate security transactions under which the breach of contract claim and the breach of fiduciary duty claim against my client Berry arise from. And though the deemed dividend payments or the income stream payments do show that Bennett was always sharing in the upside of Berry, the potential upside, that's not the security transaction. That's just — that's just the payment. That's the basis for the claim. He didn't receive that. The three security transactions, and the one I like to focus on the most, is the 1986 rescission of the victory — of the victory shares. And so Section 510B of the Bankruptcy Code, in addition to having the damages clause that was spoken about in the appellant's argument, has the rescission clause. And the rescission clause says that subordination is mandatory for claims that arise from the rescission of the purchase or sale of a security of the debtor. In 1986, the victory shares, which were owned by — the reason they're named victory shares is that was the owner of the shares, were retired, rescinded. How did the victory shares get into this mix? May we start with Mr. Bennett's uncle owning a company, leaving the shares in a trust fund. Where did victory come into the game? At some point, they acquired the shares that were subject to the — what's been called in the briefs the Group B legend. So you're correct, Your Honor. Initially, there was a bequest of stock in Berry Holding Company. That became the corpus of a trust, and dividends were paid into the trust, and then certain percentages were paid out. After 1949, there was an agreement, there was a court order, that removed the dividend — that removed the stock from the corpus of the trust and therefore allowed it to be sort of freely sold on the market. Those shares, though, had the notation that — the notation to ensure that Mr. Bennett and the others that were in the Group B still received their portion of the dividends attributable to those shares if Berry declared dividends. Who would buy a stock like that? I guess you get a discount, right? Because you're not getting your full share. But the record doesn't indicate exactly how victory came to acquire those shares. But one would think that either someone in Group B or there was also a Group C, according to the will, one of them sold the shares to victory or to someone who then sold it to victory. So they carried that — they carried that notation up to 1986. And to settle a dispute between Berry and victory, there was a rescission of those shares. And that's — and you can see that in the Declaration of Trust. It's in — there's two records on appeal here. The first record on appeal from the original case, at 2397 to 2399, discusses the rescission of the victory shares and discusses the agreement that Berry entered into to ensure that Mr. Bennett and the other surviving members of the B Group would still receive the dividend payments, still receive their share of the dividends, as if those shares had not been retired. So there's a direct linear relationship from the initial bequest of the stock. It then has a notation on the stock to ensure that Bennett and his other members of the B Group get their 37.5 percent of the dividends. And then that proceeds for several decades, in which Mr. Bennett gets many millions of dollars. And then in 1986, when there's a settlement between victory and Berry, those shares are gone, but Berry makes it very clear that Mr. Bennett is still going to get the claims — the payments that he'd otherwise be entitled to. And it's those payments that ultimately stopped in 2013 and — after the merger, the Berry-Lynn merger, and that's the payments that are at the heart of the claims for breach of fiduciary duty and the breach of contract claim. And so you could look at this — and I said, you know, there are three transactions. You could look at this as arising from the original bequest. We don't think you have to go all the way — that far back. Because you could also look at it as these claims as arising from the victory trust, which was the rescission — which was the rescission and the creation of the trust, and that is allegedly breached here because Berry stopped paying the payments, or alternatively under their theory that they — Berry breached their fiduciary duty by — as the trustee of that trust. And so that's the genesis of these claims. And if you don't agree with those, if you want to look for something a little closer in time with respect to the breach of fiduciary duty claim, that arises out of the Berry-Lynn transaction itself in 2013. Because that, under their argument as to the breach of fiduciary duty, they claim in the alternative that once the — once the merger or the acquisition occurred, that Berry was no longer in a position to be making any of these payments, and that, therefore, Berry breached its fiduciary duties under the trust by entering into the agreement with Lynn. But Berry was still receiving profits, correct? Berry was still receiving profits up until the merger in 2013. So Berry becomes a — And there were two years, 2013 to when Mr. Bennett died, two years later, right? Right. And those would be — and their claim is that they should — their claim is they should be receiving Lynn dividends. Because at that point, Berry was not — it was a wholly-owned subsidiary after 2013. A wholly-owned subsidiary of Lynn was not issuing any — was not issuing any — declaring any dividends or paying — You called them deemed dividends? Is that still the term for this two-year period? That — so that's just a term of art in the contract. That's — we think that there's — I'm just trying to figure out why it's not profit-sharing. Right. It's not profit-sharing, Your Honor, because Lynn or Berry, before Lynn was — before the acquisition, could have made all the profits that they wanted, all of its profits, and kept them for itself. It had no obligation to declare or pay a dividend. Only once it declared or paid a dividend did the right to Mr. Berry — Mr. Berry's right to payment come into play. And that's actually very clear. If Berry invested profits in its own company instead of declaring dividends, Bennett gets nothing. If it had elected to do that, it absolutely could have. And we know that that — if we look at the first record on an appeal at 2399, this is the first full paragraph, and I'm reading from it. It says, this declaration of trust is not intended to and shall not constitute a guarantee that Berry Petroleum will continue to declare and pay dividends on its capital stock, and if such dividends are reduced or eliminated altogether in the future, payments to the life beneficiaries, which would include Mr. Bennett, under this declaration of trust will be correspondingly reduced or eliminated. So it's not a profit-sharing agreement, Your Honor, because all profits — some set percentage of profits would have to flow through. Here, Berry reserved the right not to declare or pay a dividend, and if it did not declare or pay a dividend, it didn't have any obligation to pay. What's the date of the reservation you were reading from? That is the trust agreement from — the Victory Trust Declaration of Trust from 1986. It is November, looks like, 9th, 1986. And that is the agreement that Mr. Bennett, a state, alleged was breached in the breach of contract claim. So the breach of contract claim in bankruptcy is, again, in the record on appeal at 2696-98. That's their — and that was subject to the first bankruptcy court order, so, you know, there's two bankruptcy court decisions here. The breach of contract claim was at 2696-98. It says that Berry breached the Victory Trust by not paying the dividends, the deemed dividend payments. And then the second claim is the breach — But in that time period, Lynn was declaring dividends in that 2013 to 2015? Yes, Your Honor. Do you think that $9 million would be an accurate math if that money were owed off the Lynn dividends? I'm not sure, Your Honor, but the answer is yes, that there were dividends that were being paid. They've made a claim for $9 million, approximately $9 million of those Lynn dividends. And nobody's ever checked that math? I can't — I'm sure they have, Your Honor. I can't speak to that. But all I know now is that it does — that number doesn't — they're not going to get $9 million because of the way the confirmed plan — it's all been subsumed by the confirmed bankruptcy plan, which means they're going to get a certain — they're going to get a certain stock. I just would think that somewhere in the litigation somebody would have checked the math. Right. I think now it's just become, frankly, academic just given the confirmed plan. So that's unfortunately why I can't answer Your Honor's question, and I apologize. Just the second — in the second claim, I was just speaking about the breach of contract claim. The second claim against Berry is the breach of fiduciary duty claim. The bankruptcy court allowed an amendment to that. And the ultimate final language, the final claim, is in the second record on appeal at 2252-57. And that claim shows — alleges that there was a breach of fiduciary duty to Bennett, that Berry breached fiduciary duties to Bennett by entering into the Lynn-Berry transaction itself. So those are the two claims. And they both either — they allege either breach of the victory trust agreement, which is a rescission of the stock, as I just discussed, or they allege a breach of fiduciary duty with respect to that trust, which is also — which also involves a rescission of claims. And so we think — so we think that 510 — 510B was correctly invoked here by both the district court and the bankruptcy court because these claims arise from the rescission of a — of a security. And the security here — you don't have to — you don't have to decide that a security is the deemed dividend payments, the income stream payments. The stock is either — is the victory shares. Those were the shares of Berry that were rescinded in 1986 and from which these breach of contract claims and the breach of fiduciary duty claims arise because when they were rescinded, the victory trust was created. What about the arguments you made on discovery that if they could figure out — help us all figure out how we went from all this money to bankruptcy in such a short time, that that could have impact on this? That's — those are, at best, liability questions. And as Your Honor pointed out earlier, the district court assumed for purposes of subordination all the facts that were alleged in the underlying counterclaim that gave rise to this claim. So we should assume elder abuse, fraud, breach of fiduciary duty for purposes of deciding this case. For my client, the only claims against my client are the claims for breach of contract and breach of fiduciary duty against Berry. And we accept it solely for purposes of subordination. Anyone arguing for the appellee side. That's correct. Both sides. I can say that both sides assumed the facts solely for purposes, you know, not admitting liability. No, I get that. Right. If you were to send it back, there would be vigorous dispute over liability. And then there would need to be discovery. Yes, absolutely. We agree that there would need to be discovery. So if we were to reverse the district court in the one case, the bankruptcy court in the other, it would be remanded for a full trial on the merits, liability, et cetera. It would be remanded for further consideration of the objections to the claim, one of which is that there's no liability. And there's another objection, I believe, as well. I would also, I would, as a, I would clarify, though, that with respect to the breach of fiduciary duty claim for the second appeal, the appellants have abandoned their discovery argument. They don't brief that. They conceded below that they don't need discovery for that. So the discovery really only pertains to the breach of contract claim. And I can't, for the life of me, figure out what's different about them. With respect to Berry, because they're both arising from the Victory, they're both arising from the Victory Trust or the original bequest of the shares. So I think their concession on, on, on the breach of fiduciary duty claim undermines. Normally you need more discovery on breach of fiduciary duty than you do on, but maybe they just think it's so obvious they'd win. Right. You're right, Your Honor. And the only other thing that I, I heard him, I guess you, you, it was, I think that you can resolve all of this, and the district court and the bankruptcy court did, by looking at the plain language, most principally of the Victory Trust agreement that I, that I, that I talk about. This is four corners legal, legal argument the district court properly considered subordination. At most it's a mixed question of law and fact, and if the facts were assumed, then you're just applying the law to the accepted facts. So there's no reason to, to remand for, for discovery. And I think that, you know, ultimately the, the one constant, even as things changed over time from holding the stock in trust to having the legend on the stock to having the Victory Trust agreement, the one constant here is that Mr. Bennett shared the risks and rewards of being a shareholder, even if, with respect to these shares, he wasn't technically a shareholder. He received payments just as though he was a shareholder. He had enjoyed the potential upside just as he was a shareholder. He enjoyed the risk of insolvency just as he was a shareholder. And that, and that's in contrast to the relative safety of a fixed return. There is no, I haven't heard any identification of a fixed debt obligation that Barry or Lynn were paying out here. It's simply a, at most a synthetic dividend always tied to the profits and the success of, of Barry. And that, you know, the Bankruptcy Code is very clear in looking to the substance, not the form, and to sort of accept the appellant's argument, I think, would invite, you know, would look to form over substance. And my final note is I think this Court's decision in Sequest is very helpful. It involves the rescission category. It involved a circumstance where shares were rescinded pursuant to a settlement agreement and the claimant was entitled to payment that the debtor never made. So, too, here Bennett seeks payment under a settlement agreement that rescinded the victory shares. I think you can apply Sequest, and we respectfully ask that you do. And if there are no further questions, we respectfully ask for you to affirm. Okay. Thank you. Yes, thank you for the opportunity for rebuttal. First of all, with respect to the victory rescission in 1986, this was not a security in and of itself of the debtor, even if you could find that it's a security in and of itself. It wasn't a security at that time in 1986. It was rather a contractual obligation of Barry Petroleum Company, and that was pursuant to a 1949 agreement. And the only relation to any security was the fact that it was secured by that contractual obligation, similar to a debt was secured by an equitable charge or a lien against some of the shares. The contractual payments and the amount of those were simply tied to the dividends under the securities. Other than that, they bore no resemblance at all to securities. So we just simply don't believe that 1986 can provide the basis for any claim or the underlying facts to support the claim arising from the sale or rescission of a security. Council mentioned the inapplicability of the provision concerning profit-sharing agreements, and we agree they're not identical. But the question is, what do the income stream payments most resemble? And we believe, just looking at the list of enumerated examples in Section 101.49, that that's the closest because these simply talk about the sharing of profits or the dividends. Finally, with respect to the shared risks and rewards, there really is only one reward that anyone's pointed to, and that would be the fact that there are payments made that mirror the amount of dividends. These weren't dividends themselves. The Bennett interests never received any or there was no equity that was ultimately tied to these income stream payments. It was just a fixed return. And although it wasn't liquidated, this was a contractually required payment that only resembled securities in the amount of compensation, and that's it. Unless the court has any questions, I'd be happy to ask. Thank you.